**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JESSICA DEL CASTILLO,**<br>Plaintiff,<br>v.<br>**JOHN PHELAN,**<br>Defendant. | Case No. 25-cv-1876 (CRC) |

**MEMORANDUM OPINION**

In March 2017, Marine Corps Major Jessica Del Castillo, then a Captain, appeared before a Board of Inquiry ("BOI" or "the Board") to answer an accusation that she had engaged in an extramarital affair with a fellow Marine Corps captain. After a one-day hearing, the BOI determined Del Castillo had committed adultery and engaged in conduct unbecoming of an officer in violation of the Uniform Code of Military Justice ("UCMJ"). Though the BOI did not recommend separation from the armed services, the adverse finding in her record—endorsed by various senior officers who reviewed the BOI decision—obstructed her promotion up the ranks.

Major Del Castillo petitioned the Board for Correction of Naval Records ("BCNR" or "agency") for relief in May 2020, requesting removal of the adverse information from her military record based on various alleged defects in the BOI proceedings. When the BCNR denied her request, she brought her challenge to this Court. Del Castillo contends that the BCNR's decision was unlawful under the Administrative Procedure Act ("APA"). Both parties have moved for summary judgment.

As explained below, the Court will grant partial summary judgment to the government and partial summary judgment to Major Del Castillo, remanding the case in relevant part to the BCNR for further adjudication in accordance with this Memorandum Opinion.

## I. Background

### A. Legal Background

When a branch of the United States military seeks to remove one of its officers for objectionable conduct, it may do so through a BOI, an administrative mechanism established by Congress for effecting separation. 10 U.S.C. § 1182(a); see also Lewis v. Del Toro, No. 23-cv-1074 (RDA), 2024 WL 3236412, at *1 (E.D. Va. June 28, 2024). Congress provided that the secretary of the relevant military department would "prescribe, by regulation, procedures for the review . . . of the record of . . . [the] commissioned officer . . . to determine whether such officer should be required, because of misconduct" or "moral or professional dereliction," to "show cause for his retention on active duty." 10 U.S.C. § 1181(b); see also Brezler v. Mills, 220 F. Supp. 3d 303, 309 (E.D.N.Y. 2016) (describing how § 1181(b) applies to Naval and Marine Corps separations). Congress likewise established a few baseline protections for officers accused of misconduct, including that they be given a reasonable time to prepare their case for retention; afforded a right to counsel; and "allowed full access to," and "be furnished copies of, records relevant to [their] case[.]" 10 U.S.C. § 1185(a); see also Milas v. United States, 42 Fed. Cl. 704, 717–18 (1999), aff'd, 217 F.3d 854 (Fed. Cir. 1999).

Secretary of the Navy Instruction ("SECNAVINST") 1920.6C, Enclosure 8 governs Naval and Marine Corps BOIs. According to the SECNAVINST, the "purpose of a BOI is to give officers a full and impartial hearing at which they may respond to and rebut the allegations which form the basis for separation . . . and present matters favorable to their case on the issues of separation/characterization of service." SECNAVINST 1920.6C, Encl. 8 ¶ 1. BOI hearings "must be conducted in a fair and impartial manner to ensure the respondents have the opportunity to present their case." Id. ¶ 10.

Though BOIs are not courts of law or courts-martial, Board hearings resemble court proceedings in some ways. The Board consists of three officers in the same armed force as the respondent, with the senior member sitting as "presiding officer." Id. ¶ 4(i). In this capacity, the senior member "rule[s] on all matters of procedure and evidence, but may be overruled by a majority of the Board." Id. Respondents have the right to present oral argument, as well as to question witnesses under oath. Id. ¶ 6(c), (i). Critically, the rules of evidence do not apply, and BOIs may accept oral or written matter not admissible in a court of law. Id. ¶ 10(a)–(b). Still, proffered materials "may be subject to reasonable restrictions as to authenticity, relevance, materiality, and competency as determined by" the Board itself. Id. ¶ 10(c).

At the BOI proceeding, the government is represented by a nonvoting "Recorder" who prosecutes the case for separation. Id. ¶ 4(j). Once the evidence has been submitted and each side has rested, the Board votes to determine "(1) whether the reasons [justifying administrative separation] have been proven; (2) if so, whether to separate the officer from active duty; and (3) if so, the recommended characterization of the officer's service." Lewis, 2024 WL 3236412, at *2. The BOI makes findings "on each of the reasons for separation . . . based on a preponderance of the evidence." SECNAVINST 1920.6C, Encl. 8 ¶ 11(a).

Subsequently, the authority that ordered the BOI to convene (for instance, a commanding general) makes a record of Board proceedings. That record includes a transcript of the hearing, a report of the Board's findings and recommendations, and any minority report from a non-concurring member. Id. ¶ 12. The convening authority forwards the BOI record of proceedings to various officers up the chain of command for review and endorsement. Id. ¶ 13.

If the respondent is unsatisfied with a BOI determination that has become part of her military record, she may petition the BCNR for correction. See Lewis, 2024 WL 3236412, at *2;

10 U.S.C. § 1552. The BCNR is "not an investigative body." 32 C.F.R. § 723.2(b). Instead, "[i]ts function is to consider applications properly before it for the purpose of determining the existence of error or injustice in the naval records of current and former members of the Navy and Marine Corps." Id. The BCNR has "jurisdiction to review and determine all matters properly brought before it." Id. § 723.2(c). As the parties agreed at the motions hearing in this case, the body reviews the entire record below—rather than a standalone BOI decision or report—to determine whether a record correction is warranted. See, e.g., Mots. for Summ. J. Hearing Rough Tr. ("MSJ Hr'g Rough Tr.") at 3–4. The BCNR may also consider "advisory opinion[s]" from reviewing administrative entities. 32 C.F.R. § 723.3(e)(4).

Each application submitted to the BCNR is reviewed by a three-member panel sitting in executive session. Id. § 723.3(e)(1). The panel "may deny an application in executive session if it determines that the evidence of record fails to demonstrate the existence of probable material error or injustice." Id. § 723.3(e)(2). And it "relies on a presumption of regularity to support the official actions of public officers," presupposing that officers "have properly discharged their official duties" in the absence of "substantial evidence to the contrary." Id. § 723.3(e)(2). "A final decision of the BCNR is subject to judicial review under § 706" of the APA. Pettiford v. Sec'y of Navy, 774 F. Supp. 2d 173, 181 (D.D.C. 2011).

B. Factual Background

Major Jessica Del Castillo is an active-duty officer in the United States Marine Corps. She enlisted in 2005 and received her designation as a Naval aviator in 2014. AR 998–1001,

1563. A little over two decades into her military career, then-Captain Del Castillo[1] was accused of committing adultery with a colleague, Captain Cameron Burnett.

The adultery allegations originated with Captain Burnett's wife, Valerie Burnett. In March 2017, Mrs. Burnett messaged her husband and Captain Del Castillo on Facebook, accusing them of having begun an extramarital affair while deployed together to Okinawa in 2015. AR 81. Del Castillo's husband, Francisco Del Castillo, learned of the alleged affair and met Mrs. Burnett at a Dunkin' Donuts a few days later, where she told him that she had text messages and phone records proving the affair but refused to produce them at the time. AR 81–82, 234. Mr. Del Castillo recorded the conversation. AR 81, 267. He then reported the suspected liaison to the Marine Corps Family Readiness Officer, who in turn relayed the information to Del Castillo's Commanding Officer. AR 82, 260.

Four days after the fateful Dunkin' Donuts meet-up, Mr. Del Castillo recanted his statement in a short email to the Commanding Officer and Investigating Officer ("IO") who had been assigned to the matter. AR 490. Declining to participate further in the disciplinary inquiry, he explained that he had "no proof of admission of guilt" from his wife. Id. Mr. Del Castillo additionally opined that Mrs. Burnett's accusations were "unfounded and [had] not been validated." Id. "The conversations I had with my wife after I had been informed of [the adultery] allegations had me in a state of mind where I was confused, frightened and gullible," he elaborated. Id. "I rushed to judgment from a woman I had just met that had ongoing issues with her marr[i]age. Her denying the situation now, illustrates that her intention was to sab[o]tage my

[1] This recitation of the facts refers to Del Castillo as a captain, her rank at the time of the events in question. In later sections of this Memorandum Opinion, the Court resumes referring to Del Castillo as a major, her current rank.

own marriage to mirror the status o[f] hers. Now I feel that I have destroyed two careers for a futile allegation that has no merit." Id.

The preliminary inquiry into the adultery accusation concluded the next day, as the IO determined there was "not enough evidence . . . to support the claims that Capt Jessica Del Castillo and Capt Cameron Burnett were involved in an adulterous relationship." AR 82. According to the IO, the given statements were "full of contradictions." Id. While the IO recommended that Burnett be returned home for "human factors,"[2] he recommended that Del Castillo continue to serve. Id. The next day, the Commanding Officer nonetheless notified both Del Castillo and Burnett that they would be returning to their parent command. Id.

The story doesn't end there. The Commanding General of the Second Marine Aircraft Wing initiated a separate command investigation in April, which determined that Del Castillo and Burnett *had* engaged in adultery. AR 82–83, 268. The Commanding General of II Marine Expeditionary Force ("CG II MEF"), in turn, "reviewed the allegations of misconduct" and "determined that there [was] sufficient information to refer th[e] case to a Board of Inquiry for a recommendation as to whether Captain Del Castillo and Captain Burnett should be retained in the Marine Corps." AR 64. A joint BOI hearing for both respondents was set for December 2017. AR 203.

*1. Contested Text Message and Phone Records*

Just a few days before the BOI convened, Mrs. Burnett sent the government two sets of records, whose authenticity and admissibility would become a major point of contention at the

[2] The Court understands "human factors" to refer to non-service-related (*e.g.*, psychological, medical, personal, economic) factors that may affect the mental and physical readiness of a given unit, in this case a flight crew. See AR 217–18, 259, 273, 281.

hearing. *First*, she sent what she described as dozens of text message strings between her husband and Captain Del Castillo. See generally AR 102–78. An example is reproduced below.




See AR 169. Many of the text messages were time-stamped with dates that preceded Del Castillo's enlistment in the Marine Corps, see, e.g., AR 108, 114, while others were dated years into the future, see, e.g., 103, 106, 107, 136, 162–168. The Recorder forwarded the text strings to Del Castillo's defense counsel the night before the hearing. AR 102.

*Second*, Mrs. Burnett sent the government several Excel workbooks and thousands of pages of additional documentation, purporting to be her husband's phone records. See AR 176–77; see also AR 407–79. According to Mrs. Burnett, the records demonstrated a significant volume of texts and phone calls between Captains Burnett and Del Castillo. AR 176. The government produced these phone records to Del Castillo's defense counsel on the morning of the BOI proceeding. See AR 87–88.

During the BOI hearing, the respondents' attorneys objected to the admission of this fresh evidence, contending that it was both untimely and unauthenticated. AR 220. They did not seek a continuance, however, and despite the short notice, managed to poke numerous holes in the evidence. See AR 220 ("The timeliness is one issue [with the text messages], but we have looked through them. Within 12 hours, we were able to basically show that these text messages are not accurate."). In some texts, for instance, Captain Burnett appeared to be "talking to

subordinates" who responded "Yes, sir" to his messages and discussed "missions that they flew that ha[d] nothing to do with" Captain Del Castillo. AR 221. In another message, Burnett appeared to be asking a "male pilot friend of his" about a smoothie. Id. Del Castillo's attorneys called one of the listed numbers in the records, and it turned out to be a gunnery sergeant who had "nothing to do with this case." AR 220. According to the defense, Mrs. Burnett's records reflected phone contact between Burnett and "at least ten different people," amounting to "cut-and-pasted" and "cherry picked" evidence that was "very misleading." Id.

The Recorder defended the contested evidence in several ways. As to the text messages, the Recorder maintained that, even if some of the dates and times were inaccurate, the veracity of certain messages was corroborated by independent evidence, such as room receipts for stays booked by Captains Del Castillo and Burnett. AR 223. Additionally, the Recorder stated that the phone records "[we]re not fabricated" because "AT&T provides detailed call records in an Excel spreadsheet due to the volume." Id. Finally, in further attempting to shore up the reliability of the text messages, the Recorder said that he "personally went" to the Bachelor Officer Quarters ("BOQ") where Del Castillo and Burnett allegedly held some of their assignations, and the manager told him she "does not give out any information regarding—[.]" Id. Here, Del Castillo's counsel interrupted, objecting that the Recorder was "not a witness" and could not be cross-examined, but the Senior Board Member never ruled on the objection. Id. Despite repeated protests by Del Castillo's counsel, the Board deferred the question of the admissibility of the text and phone records for most of the hearing.

Just before closing arguments, the Senior Board Member finally decided to admit the contested records into evidence. AR 320. "I['m] going to go ahead and admit it," he explained, "[b]ut with that said, I'm going to make sure . . . the board gives it the weight based on the

evidence during our deliberations. So I'm going to go ahead and admit it, and we will be weigh[ing] it during our discussions as we see appropriate." Id. In his closing argument, the Recorder acknowledged that there were some discrepancies in the contested records—some of the texts had nonsensical dates or were exchanged with individuals who were obviously not Captain Del Castillo herself—but maintained that that the records were "legitimate." AR 325.

*2. Other Evidence*

In addition to the disputed text messages and phone records, the government presented other pieces of inculpatory evidence during the BOI hearing.

*First*, another captain who was deployed to Okinawa at the same time as Captains Del Castillo and Burnett testified at the hearing. On one of their nights together abroad, he recalled witnessing Del Castillo pass a room key to Burnett, who later entered Del Castillo's residential building despite living a quarter mile away. AR 243. Although the captain "never really thought anything about it at the time," he reflected that it was "definitely out of the ordinary and kind of raised suspicion," once he caught wind of the suspected affair from Mrs. Burnett, who happened to be a friend of the captain's wife. AR 243–44.

*Second*, the government described "implicit message[s]" in a Facebook exchange between Mrs. Burnett and Captains Burnett and Del Castillo, along with a subsequent email between the two wherein Del Castillo reported "[c]all[ing] [Mrs. Burnett] to let her vent." AR 323. In the Recorder's telling, Del Castillo and Burnett's failure to explicitly deny the affair during both exchanges confirmed that "they all kn[ew] what [was] going on, all three of them." AR 323; see also AR 323–24 ("You vent about something. . . . Everybody involved knew exactly what was happening.").

*Third*, the government pointed to two BOQ receipts showing that Captains Del Castillo and Burnett reserved rooms in December 2015 and February 2016, paying in cash. The receipts line up with text message exchanges appearing to discuss liaisons at the BOQ. AR 324–26.

*Fourth*, the Recorder called the Commanding Officer who initially placed Captain Del Castillo and Burnett on liberty upon learning of the alleged affair. Although he disclaimed noticing any "indication" that the captains were engaged in misconduct, see AR 259, he did explain that the tension and distraction bubbling within the unit was a detrimental "human factor" that put others at risk, see AR 262–63 ("[D]istractions stemming from relationships – if not properly sort of quarantined, can lead to being very distracted in the cockpit. . . . [T]hat is a risk that I was not willing to take."). In addition, the Commanding Officer relayed his conversations with Mr. Del Castillo at the time of the preliminary inquiry, during which the latter explained that his wife had admitted the affair to him and other family members. AR 261–62.

In her defense, Captain Del Castillo's counsel called several Marine officers to testify that both captains had always carried themselves professionally, were "trustworthy," and had not engaged in inappropriate conduct, to the witnesses' knowledge. AR 286, 293, 295, 299. Neither captain elected to testify under oath, instead providing unsworn statements that were not subject to cross-examination. AR 304, 319.

In the government's closing argument, the Recorder drew attention to Captain Del Castillo's decision not to testify, encouraging the Board to "consider the questions that you just had about the unsworn statements. Even now, as all of this has come forward, these individuals aren't taking the stand." AR 321. Del Castillo's counsel immediately objected that it was impermissible to comment on someone's right not to testify under oath. Id. The Senior Board Member sustained the objection. Id.

After deliberation, the Board concluded, by a preponderance of the evidence, that Captain Del Castillo had committed adultery and engaged in conduct unbecoming of an officer. AR 57. (The record before the Court does not reveal the BOI's findings as to Captain Burnett.) After the majority initially recommended a suspended separation (which is not a recommendation that the BOI can make), see AR 1272, the Board reconvened, and the majority decided that Del Castillo should be retained, see AR 1268–69. The Senior Board Member disagreed, lodging a minority report that recommended her separation. AR 55. As required under the SECNAVINST, the Senior Board Member also issued a report outlining the procedural history of the case and the Board's findings. AR 1266–70. The CG of the Second Marine Aircraft Wing and CG II MEF endorsed the report, the latter over the written objections of Del Castillo's counsel. See AR 1265, 60-62. The Board's adverse finding was incorporated into Del Castillo's military record.

C. Procedural Background

Dissatisfied with the result of the BOI proceeding and subsequent endorsements, Captain Del Castillo turned to the BCNR, petitioning that body to correct the adverse personnel findings in her military record. AR 34–35. By this time, Del Castillo had acquired some new evidence: her *own* verified phone records from Sprint. AR 351–405. Those records showed no cell phone activity during the month of September 2015, at a time when the government insisted she texted with Captain Burnett about meeting up in Okinawa. AR 42–43; see also AR 169 (text message dated September 14, 2015, stating "[l]eft key under your name at desk").

The BCNR panel considered two advisory opinions, alongside Captain Del Castillo's briefing and proffered evidence. *First*, the Marine Corps Military Personnel Branch ("JPL") submitted an advisory opinion concluding that Del Castillo had "not provided substantial evidence demonstrating the existence of a probable material error or injustice warranting

removal of the materials at issue." AR 27–33. Del Castillo filed a detailed rebuttal to the JPL advisory opinion, objecting to (among other things) the timeliness of the government's production of new evidence and explaining that she did not request a continuance because doing so would be "improper burden shifting." AR 12–18. She included emails from her defense counsel attesting to this position. AR 21–24. *Second*, the Marine Corps Performance Evaluation Review Board ("PERB") issued a more cursory advisory opinion recommending that Del Castillo's petition be denied. AR 1016–22.

In March 2021, the BCNR decided that Captain Del Castillo had not established the existence of a material error or injustice in her personnel record, "substantially concurr[ing]" with the JPL and PERB advisory opinions that reached the same conclusion. AR 1–3.

Though she would eventually be promoted to Major, Del Castillo asserts that she sought and was denied promotion four times as a result of the adverse personnel action in her service record. Compl. ¶ 38. She filed her complaint before this Court in June 2025, arguing the BCNR's decision was arbitrary and capricious in violation of the APA. See Compl. ¶¶ 1, 3.[3] Both parties have since filed cross motions for summary judgment. The Court held a hearing on the dueling motions, and they are now ripe for adjudication.

---

[3] Del Castillo's complaint alleges that the BCNR's actions were not only arbitrary and capricious, but also contrary to law and an abuse of discretion. Compl. at 8. Because her summary judgment briefing does not meaningfully address the latter two grounds for setting aside the agency's decision, the Court will not consider them, as "[m]entioning an argument in the most skeletal way . . . is tantamount to failing to raise it." Al-Tamimi v. Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019) (cleaned up); see also Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 196 (D.C. Cir. 1992) (explaining that courts generally do not consider arguments that are "ignored or left undeveloped by counsel in the first round of briefing").

## II. Legal Standards

When reviewing final agency action under the APA, a district court "sits as an appellate tribunal," with "[t]he entire case on review" as "a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (cleaned up). "In the APA context, summary judgment is the mechanism for deciding whether, as a matter of law, an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." Gulf Restoration Network v. Bernhardt, 456 F. Supp. 3d 81, 93 (D.D.C. 2020).

Federal district courts have authority, under the APA, to review a decision by the BCNR to deny corrective relief. See Kreis v. Sec'y of Air Force, 866 F.2d 1508, 1515 (D.C. Cir. 1989). One basis for setting aside agency action is that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). This familiar standard is a deferential one, even more so in a military context. See Cone v. Caldera, 223 F.3d 789, 793 (D.C. Cir. 2000) (noting that courts review military decisions under "an unusually deferential application of the arbitrary or capricious standard" (cleaned up)). Furthermore, a "reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Gillan v. Winter, 474 F.3d 813, 819 (D.C. Cir. 2007) (citation omitted).

Despite the deferential nature of the court's arbitrary-and-capricious review, the BCNR may act arbitrarily if it fails to respond to an argument that is not "frivolous on [its] face and could affect" the "ultimate disposition." Rutledge v. Del Toro, No. 23-cv-1583 (CRC), 2024 WL 3225958, at *7 (D.D.C. June 28, 2024) (alteration in original) (quoting Frizelle v. Slater, 111 F.3d 172, 177 (D.C. Cir. 1997)). The BCNR's "failure" to "adequately explain its decision" is grounds for remand to the agency. Gann v. Del Toro, No. 20-cv-3198 (RJL), 2021 WL 6049907,

at * 8 (D.D.C. Dec. 21, 2021) (citing Dickson v. Sec'y of Def., 68 F.3d 1396, 1404–07 (D.C. Cir. 1995)).

## III. Analysis

Major Del Castillo challenges the BCNR's refusal to correct her personnel record on several grounds. She first asserts that the BCNR did not grapple with her Sprint phone records, which, in her view, prove that the government's proffered text and phone record evidence was fabricated. Next, Del Castillo contends that the BCNR either failed to address or inadequately addressed various forms of prosecutorial misconduct at the BOI hearing. And lastly, she argues that the BCNR applied an improper standard of review in assessing the record evidence before it. The Court takes each cluster of arguments in turn.

### A. New Sprint Evidence

Major Del Castillo argues the new Sprint phone records she produced to the BCNR fatally undermine the basis for the BOI's decision and that the BCNR either did not consider her records or failed to account for them. Pl.'s Mot. for Summ. J. ("Pl.'s MSJ") at 19–22. But the agency *did* consider the Sprint phone records. It was simply not persuaded that they evinced a material error or injustice in her personnel record.

To begin, the BCNR expressly "noted" Major Del Castillo's objection to the authenticity of Captain Burnett's cell phone records and further observed that members of the BOI "clearly understood that they could challenge the cell phone records' authenticity during their deliberations." AR 2. The BCNR also commented that "although not required, the BOI members determined that they had significant evidence to corroborate the authenticity of the most relevant portions of the text messages." Id. The BCNR decision thus recognized that the Board was entitled to decide for itself whether the cell phone records were sufficiently authentic

to consider. That recognition is consistent with the governing agency authority, which makes clear that "BOIs are not courts-martial and the rules of evidence do not apply," "[o]ral or written matter not admissible in a court of law may b[e] accepted by BOIs," and "[o]ral or written matter presented may be subject to reasonable restrictions as to authenticity . . . *as determined by the BOI*." SECNAVINST 1920.6C, Encl. 8 ¶ 10(a)–(c) (emphasis added).[4]

Of course, Major Del Castillo's Sprint phone records, if presented at the BOI hearing, may have discredited some of the government's evidence. The records appear to show that there were no phone records associated with Del Castillo's mobile number for the month of September 2015, coinciding with her active deployment overseas. AR 352. The Sprint records thus seem to belie that Del Castillo sent or received a September 14, 2015 text message saying, "Left key under your name at desk," as the Recorder suggested based on Mrs. Burnett's furnished records. AR 169. The Sprint records also show Del Castillo making only one call to Capital Burnett on December 16, 2026, see AR 404, rather than three calls, which is what Mrs. Burnett's call records reflect, see AR 440.

As compelling as Del Castillo's new evidence may be on certain points, the Court is not in a position to re-weigh that evidence; its only role is to assess the reasonableness of the BCNR's review of the BOI decision (and the overall record before it). As the agency explained,

[4] It would surely be troubling if, due to these permissive evidentiary standards, the BOI were allowed to admit and credit a body of evidence that was discernibly and wholly fabricated. The parties appear to agree that such a scenario may run afoul of the SECNAVINST's guarantee of a "fair and impartial" BOI hearing. MSJ Hr'g Rough Tr. at 48–49 (government acknowledging, in a colloquy with the Court, that "there is a line" past which the admission of certain evidence may violate a respondent's right to a fair and impartial hearing). But per the BCNR's reasonable analysis, this case does not approach that extreme hypothetical, both because the BOI may not have credited those elements of the record it did not deem authentic and because, even by Major Del Castillo's account, the Board's conclusion did not rest on a record that was fully fabricated, even if some pieces of it were unreliable or erroneous.

the Sprint records did not "disprove the evidence offered by the government." AR 2. The agency "substantially concurred" with the JPL advisory opinion, id., which likewise elaborated that the new evidence did "not prove that the government's records were false," but "merely show[ed] that [Del Castillo's] records contradict[ed] the government's," AR 9. In other words, the Sprint records may have called the *accuracy* of the government's evidence into question (*i.e.*, showed that certain of the admitted messages did not involve Major Del Castillo as advertised) but did not establish that they were not what they generally appeared to be (*i.e.,* Captain Burnett's phone and text messages with, as it turned out, various individuals). As a result, the BCNR reasonably determined that Del Castillo "failed to demonstrate that . . . the BOI's decision to admit unauthenticated cell phone records was in error or unjust." AR 2.

Major Del Castillo counters that the question before the BCNR was "not whether Major Del Castillo 'disproved' the Government's case" but "whether she presented substantial evidence of [a material] error or injustice." Pl.'s MSJ at 21. True enough. But the Court is hard-pressed to declare that the new evidence reveals an error or injustice in the underlying BOI proceeding when the Board did not have this evidence before it at the time of its decision. In any event, the BCNR actually considered the weight and consequence of the newly-proffered evidence. For reasons that are owed substantial deference, it concluded that the Sprint records did not demonstrate that the Board's decision to admit the government's text and phone evidence was fundamentally erroneous, especially because the Board was at liberty to "challenge the cell phone records' authenticity during their deliberations." AR 2.

To be sure, the BCNR could have better explained the distinction between "contradicting" and "disproving" the government's evidence. But the agency seems to be getting at the difference between the *weight* and the *authenticity* of evidence; the former is for the BOI

to assess in the first instance, and the latter is for the BOI to regulate as it sees fit. Even if the BCNR's explanation was "of less than ideal clarity," its "path" could "reasonably be discerned." Gillan, 474 F.3d at 819. Given the deferential and limited scope of review, the Court cannot say that the BCNR's treatment of Del Castillo's new evidence was unreasonable.[5]

B. Prosecutorial Misconduct

Next, the Court turns to Major Del Castillo's accusations of prosecutorial misconduct, which, she insists, deprived her of a full and fair hearing before the BOI. Del Castillo advances a few grievances. She asserts that the Recorder acted improperly by commenting on her refusal to provide sworn testimony at the BOI hearing. See Pl.'s MSJ at 27–28. She submits that the government engaged in "ambush discovery" that prejudiced the outcome of the hearing. See id. at 28–31. And she criticizes the Recorder for engaging in "vouching" that compromised the proceeding's fairness.[6] See id. at 24–27. While the BCNR adequately addressed Del Castillo's first and second grievances, it did not do so as to her third.

[5] The Court pauses here to acknowledge the obvious: Administrative separation proceedings have far fewer procedural guardrails than a court-martial or Article III court-based trial. In a proceeding where rules of evidence applied, Mrs. Burnett's phone records may very well have been inadmissible. But Major Del Castillo has not facially challenged the lawfulness of the SECNAVINST guidelines, meaning that—for the purposes of this case—she has accepted the BOI process for what it is. As a result, the Court may only consider whether she was treated impermissibly within its bounds.

[6] At the motions hearing, Major Del Castillo's counsel raised at least one additional complaint about the Recorder's conduct—that he misinformed the BOI of the scope of their power to admit or reject certain evidence. See AR 282 (Recorder stating, "[G]entlemen, it is within your purview as board members to determine the credibility of [Mrs. Burnett's] text messages, not to find them inadmissible for any kind of pseudo-evidentiary reason. This isn't a court-martial. There doesn't have to be any kind of basis set for those text messages. They are what has been given to the government."). However, this grievance was not raised in Del Castillo's summary judgment papers, so the Court will not consider it.

*1. Commentary on Failure to Testify*

Major Del Castillo argues that the BCNR failed to address evidence that the Recorder improperly commented on her decision not to testify under oath at the BOI hearing. See Pl.'s MSJ at 27 (noting that "the Recorder began his closing argument" by remarking on Del Castillo and Burnett's decisions not to "tak[e] the stand"). Not so. While the BCNR is obliged to provide a "reasoned explanation" for its decision, it can meet that obligation by referring the reader to "clearly relevant sources other than a formal statement of reasons," including the reasoning of an advisory opinion with which it has substantially concurred. Roberts v. United States, 741 F.3d 152, 158–59 (D.C. Cir. 2014) (citations omitted).

Here, the BCNR "determined that the record contain[ed] no evidence that the [BOI] members improperly considered [Major Del Castillo's] decision not to testify." AR 2. In so concluding, the BCNR "substantially concurred" with the JPL advisory opinion, id., which likewise pointed out that there was no evidence that the members improperly considered her lack of sworn testimony because Del Castillo's counsel "immediately objected to the Recorder's statement about her choice not to testify," and the "BOI Senior Member properly sustained that objection," id. at 8. The BCNR also noted a similar observation by the CG of II MEF. See AR 2 ("The CG, II MEF also found that the Recorder's actions do not provide a basis for overturning the BOI's findings because the BOI allowed arguments and even sustained your counsel's objection to improper references to your right to remain silent.").[7] Especially under the

[7] Major Del Castillo contends that the members *did* improperly consider her decision not to testify. She points to a letter from the Assistant Commander of the Second Marine Aircraft Wing, who spoke with the BOI president and reported that "he agreed that had Captain Del Castillo presented the same evidence and testified to the board then they would have found the accusations to be unsubstantiated." AR 26; see also Pl.'s MSJ at 27–28. But one member's post hoc and secondhand speculation about what the members of the BOI might have thought is far

deferential standard of arbitrary-and-capricious review in the military-records context, the Court finds the Board's position reasonable and reasonably explained.

*2. Delay in Producing Evidence*

Next, Major Del Castillo argues that the BCNR failed to adequately address the government's late production of Captain Burnett's text messages and phone logs. In her petition to the BCNR, she asserted that the Recorder's undue delay in providing evidence—which she terms "ambush discovery," see Pl.'s MSJ at 3–5—contravened her right as a respondent to a "full and impartial hearing," as well as her right to "[f]ull access to, and copies of, records relevant to the case," id. at 23 (referring to the provisions in SECNAVINST 1920.6C, Encl. 8 ¶¶ 1, 6(d)).

The BCNR summarily "determined that the production of documents by the Recorder was neither untimely nor did the timeliness of the evidence create material error or injustice." AR 2. However, it also "substantially concurred" with the JPL advisory opinion on this point, id., and that opinion more fully explained why the delay in production did not reflect a material error or injustice. For one thing, the opinion pointed out that, "[u]nlike courts-martial," BOIs "do not impose any discovery timelines on parties." AR 8. For another, the opinion observed that Major Del Castillo "does not claim that she had insufficient time to prepare a defense." Id. Finally, the JPL opinion reasoned, Del Castillo did not request a continuance to review the evidence, and she apparently took no issue with that "presumably . . . tactical" decision because she does not now allege ineffective assistance of counsel. Id.

---

from an official pronouncement. And it is certainly not enough to find that the BCNR entirely failed to address Major Del Castillo's challenge to the Recorder's commentary.

While it is "well-settled" that the BCNR can provide a reasoned explanation by referring the reader to advisory opinions, "the advisory opinion itself must engage in reasoned decision making in order for the BCNR to cite it." Anderson v. DOD, No. 24-cv-1916 (JMC), 2026 WL 850655, at *12 (D.D.C. Mar. 27, 2026). For a few interrelated reasons, the Court is persuaded that the BCNR was entitled to rely on the advisory opinion here and that its decision as to timeliness was reasonable.

Let's begin with the observation that there are no formal discovery timelines in BOI proceedings. Major Del Castillo has not pointed the Court to any prohibition on late discovery productions, and according to an email from her own defense counsel, "at a board, [the government is] allowed to drop documents . . . at the last minute." AR 21. To be sure, the lack of discovery timeline does not mean that a late-breaking production could *never* deprive a respondent of a full and fair hearing, as that is an independent requirement under Enclosure 8 of the SECNAVINST. But the lack of discovery timeline leaves the Court with one less benchmark for measuring the reasonableness of the government's delay here.

Next, Major Del Castillo has not pinpointed *why* the delay in production was so prejudicial as to have deprived her of a full and fair hearing. The record before the BCNR reflects that Del Castillo's defense attorneys were able to undermine the reliability of the text and phone record evidence in the time they had to review the documents. See, e.g., AR 22 (letter from Del Castillo's defense counsel explaining that "in the short time [they] had the documents, [they] did show [the records] were unreliable"). The Recorder was forced to acknowledge and reckon with the shortcomings identified by Del Castillo's counsel, including that some of the proffered text strings had nonsensical dates or were between Captain Burnett and various other individuals. See AR 325. The Court can imagine some circumstances in which "ambush

discovery" could seriously prejudice a respondent and render a BOI hearing impermissibly unfair. Yet Del Castillo does not articulate the nature or extent of that prejudice here, leaving the Court with little basis to second-guess the BCNR's finding of a lack of error or injustice.

Finally, as the JPL advisory opinion noted, defense counsel's decision not to request a continuance lessens the force of Major Del Castillo's "ambush discovery" argument. See AR 8. The Court appreciates that the joint BOI proceeding in this case was difficult to schedule, and the convening authority had already denied one request for a continuance by the time the government produced the phone and text evidence to Del Castillo. See MSJ Hr'g Rough Tr. at 68. Perhaps, then, a continuance was unlikely to be granted. However, as Del Castillo's lawyers explained in later correspondence submitted to the BCNR, more time "would not have changed [their] position that [the records] were fake." AR 21. "Whether we proceeded that day or in a month, the nature/quality of the documents was not going to change," another of Del Castillo's attorneys explained. AR 22. "We did not need more time to challenge their authenticity/reliability, and the Government failed to sufficiently show their reliability/authenticity for consideration by the Board." Id. To be sure, the government bears the burden of proving its case by a preponderance of the evidence throughout the BOI proceeding.[8] But if Del Castillo believed she was so prejudiced by the late document production that she

[8] At the motions hearing, the government seemed to suggest that the burden of proof at the BOI proceeding shifts between the government and the respondent. See, e.g., MSJ Hr'g Rough Tr. at 46 (government counsel explaining that "going into the BOI it was the government's job to prove by a preponderance of the evidence . . . that the reasons presented for separating plaintiff . . . were correct," and "once they put forth 51 percent of the evidence, then the burden shift[ed] to her to put forth enough evidence to muddy the waters"). The Court can identify no support for such a burden-shifting framework, and the record evidence suggests that, before the BOI, the "burden of proof is on the government, and it never shifts." AR 208.

needed additional time to respond, it would have been incumbent upon her to ask for more time.[9] That her attorneys did not do so implies that the delayed production was not so detrimental as to cast doubt on the fundamental fairness of the BOI proceeding.[10]

In sum, the Court is persuaded that the BCNR did not act arbitrarily in rejecting Major Del Castillo's "ambush discovery" argument. Though the Recorder's "delay in turning over the evidence" to Del Castillo was—in the words of the CG II MEF—"not commendable," AR 61, the government produced Captain Burnett's text and phone records just a few days after receiving them from Mrs. Burnett. Del Castillo has not persuaded the Court that the delay deprived her of a full and fair hearing, especially given that her attorneys were able to discredit large swathes of the late-breaking evidence and did not see fit to request a continuance.

*3. Improper Vouching*

More problematic is the BCNR's treatment of Major Del Castillo's concern that the Recorder "personally vouched" for the "authenticity" of the government's phone record evidence "on multiple occasions." Pl.'s MSJ at 7. For example, the Recorder attested personally to the fact that AT&T "provides detailed call records in an Excel spreadsheet," and further attempted to

---

[9] Although Del Castillo's counsel insists that "requiring [her] to seek a continuance would be improper burden shifting" because the government had to demonstrate that the records were authentic and reliable, AR 21, that is not obvious. As explained above, the SECNAVINST does not require the government to affirmatively authenticate its evidence at a BOI proceeding, beyond whatever showing of authenticity or reliability the Board may require in its discretion.

[10] Del Castillo criticizes the JPL advisory opinion's suggestion that defense counsel had made a "tactical" decision not to request a continuance. Pl.'s MSJ at 29–30; see also AR 30. Although the opinion may have misidentified the precise rationale for the decision not to request a continuance, the letters from Del Castillo's BOI lawyers confirm that the decision *was* essentially "tactical." Her counsel did not believe that a continuance was necessary based on their assessment of the quality of the government's latest evidence and understood the government not to have carried their burden of authentication. See AR 21, 22. Thus, they deliberately chose not to request a continuance when they could have—at the very least to make their record for appeal.

report a "persona[l]" visit the Bachelor Officer Quarters to substantiate information in the texts suggesting Major Del Castillo and Captain Burnett had stayed in a room there together. AR 223. To be clear, Del Castillo does "not argue that the Senior Member lacked discretion to admit the evidence." Pl.'s MSJ at 24. Instead, she submits that the personal vouching "improperly bolstered unreliable evidence and deprived her of a fair hearing." Id.

Unlike Major Del Castillo's first two grievances, neither the BCNR nor the advisory opinions with which it substantially concurred addressed the vouching issue. The government essentially concedes as much. See Def.'s Combined Opp'n to Pl.'s Mot. for Summ. J. & Cross-Mot. for Summ. J. at 18 ("[T]he BCNR did not directly address the vouching argument in its decision[.]"). Its only meaningful rejoinder is that the BCNR generally reviewed the BOI's treatment of the cell phone records. Id. And at any rate, "both the B[CN]R decision and the referenced advisory opinions addressed" evidence "*other than* the disputed phone records," so any error in failing to address the vouching was harmless. Id. at 19 (emphasis added); see also MSJ Hr'g Rough Tr. at 61 (government counsel explaining that the BCNR's failure to address Del Castillo's vouching argument did not affect the agency's decision because "a reasonable group of people could have found that the government's adultery charge was substantiated" based on other evidence in the case).

The government glosses over Major Del Castillo's distinct concern: not that the phone record evidence was ultimately admitted, but that the Recorder's misconduct impermissibly bolstered its reliability and therefore infringed upon her right to a "full and impartial hearing," as required by BOI guidelines. See SECNAVINST 1920.6C, Encl. 8 ¶¶ 1, 10.

The BCNR has an obligation to address each nonfrivolous argument raised by the petitioner that "could affect the Board's ultimate disposition." Frizelle, 111 F.3d at 177. While

courts afford significant deference to the reasoning of BCNR decisions, they "cannot defer into a void." Rutledge, 2024 WL 3225958, at *7. Major Del Castillo raised a nonfrivolous argument about the potentially prejudicial effect of the Recorder's vouching, and neither the agency decision on review, nor any opinion it can be said to have incorporated by reference, engaged with that argument whatsoever. The government would have the Court affirm the BCNR's decision on the basis that there was *other* evidence not implicated by the alleged vouching. But as we shall see in a moment, the Court is not certain that the BCNR reviewed that independent evidence in the proper light.

While Major Del Castillo has not identified an explicit authority prohibiting vouching in a military-board context, her concern about the prejudicial nature of prosecutorial vouching is not unfounded. In a criminal context, prosecutorial vouching "pose[s] two dangers." United States v. Young, 470 U.S. 1, 18 (1985). First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented." Id. And second, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." Id. at 18–19. As such, "improper suggestions, insinuations and, especially, assertions of personal knowledge [by prosecutors] are apt to carry much weight against the accused when they should properly carry none."[11] Berger v. United States, 295 U.S.

[11] The Court further notes that Navy-appointed counsel is bound by the appropriate rules of professional conduct, which prohibit attorneys practicing under the Uniform Code of Military Justice from "allud[ing] to any matter that the covered attorney does not reasonably believe is relevant or that will not be supported by admissible evidence, assert[ing] personal knowledge of facts in issue except when testifying as a witness, or stat[ing] a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused." See 32 C.F.R. § 776.43(a)(5).

78, 88 (1935). So although the SECNAVINST imposes no express bar on prosecutorial vouching, such conduct could logically bear on the BOI's weighing of the evidence.

The Court makes no prediction one way or the other here. It could well be that the Recorder's personal vouching had little or no impact on the BCNR's ultimate decision, given the spread of available evidence, the limited scope of the vouching, and the fact that Major Del Castillo's counsel lodged a vociferous objection to the vouching during the hearing (which the Senior Board Member never actually ruled on). What matters is that the BCNR did not address Del Castillo's nonfrivolous argument, and the Court cannot say, on this record, that the argument was immaterial to the outcome of her case.

Ultimately, "[t]his court's review is limited to 'whether the [BCNR's] decision making process was *deficient*, not whether its decision was correct.'" McDonough v. Stackley, 245 F. Supp. 3d 1, 8 (D.D.C. 2017) (alterations in original) (quoting Kreis, 866 F.2d at 1511). When a court does find error in decision-making, and its bearing on the outcome is unclear, "the better course is to remand the matter to the military correction board so that it can address any deficiencies in the first instance." Id. at 9.

D. Misapplication of the Proper Evidentiary Standard

Major Del Castillo raises a final issue, which is that the BCNR reviewed the evidence before it in an erroneous light. See Pl.'s MSJ at 25–27. More specifically, Del Castillo submits that there was no direct evidence of a sexual relationship between Captain Burnett and herself, and in assessing the circumstantial evidence of such a relationship, the BCNR improperly reviewed the record "in the light most favorable to the Government." Id. at 25 (quoting AR 61).

The Court agrees with Major Del Castillo that remand on this ground is appropriate, but for a slightly different reason. The manner in which the BCNR reviewed the record is simply not

clear. The agency does not say that it considered the circumstantial evidence in the light most favorable to the government, but it cites favorably to the CG II MEF's endorsement of the BOI decision and the JPL advisory opinion, both of which apply this "light most favorable" standard. See AR 2, 6, 9. These two analyses draw an analogy between the "standard for legal sufficiency review at a court-martial" and at the BOI. AR 9, 61. On appellate review of a court-martial decision, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime" by the applicable standard. AR 9 (citation omitted); see also AR 61. Here, the CG II MEF and JPL attorney each concluded that Mr. Del Castillo's initial statement about the affair, the Facebook messages between the respondents and Mrs. Burnett, and the BOQ receipts were crucial pieces of "circumstantial evidence," which, "*when viewed in the light most favorable to the Government,*" permitted a finding that a sexual relationship existed. AR 9, 61 (emphasis added).

If the BCNR can be understood to have adopted the CG II MEF and JPL attorney's reasoning (which, again, is unclear), it acted arbitrarily. Elsewhere in its opinion, the agency carefully distinguished between the procedural guardrails that apply to courts-martial and BOIs—for instance, by noting that the military rules of evidence and discovery timelines do not apply to BOIs. See AR 30. Moreover, at a court-martial, the government must prove beyond a reasonable doubt that the charged individual committed misconduct, whereas at a BOI, it need only prove misconduct by a preponderance of the evidence. See AR 31. Given the procedural and substantive differences between courts-martial and BOIs—which the government has repeatedly emphasized—the BCNR is hard-pressed to provide a rational explanation for analogizing the two when it comes to the "appellate" standard of review. Neither the CG II MEF

nor the JPL advisory opinion cites a freestanding source of authority to justify making all reasonable evidentiary inferences in the government's favor on review of a *BOI* decision.[12]

At the motions hearing, government counsel argued that the Court should not understand the BCNR to have actually applied a "light most favorable to the government" standard to the circumstantial evidence it reviewed. MSJ Hr'g Rough Tr. at 55–59. Instead, counsel contended, the "light most favorable" standard is akin or analogical to the "presumption of regularity," id. at 55–57, which the BCNR *is* required to apply on its review of administrative proceedings below, see 32 C.F.R. § 723.3(e)(2). Counsel's comparison strikes the Court as—at best—seriously under-explained. Presuming that "public officers . . . have properly discharged their official duties" "in the absence of substantial evidence to the contrary," 32 C.F.R. § 723.3(e)(2), is conceptually different than making all permissible inferences in favor of the government when reviewing a potentially ambiguous body of evidence. The presumption implies that administrative proceedings have unfolded in a regular fashion; the standard of review serves to insulate a guilty verdict rendered by the factfinder from improper second-guessing, so long as the verdict is consistent with due process.[13] In any event, counsel's argument that the "light most

[12] The CG II MEF endorsement and JPL advisory opinion *do* cite to or reference the U.S. Court of Appeals for the Armed Forces decision United States v. Harman for the proposition that the legal sufficiency of a court-martial conviction is assessed in the light most favorable to the prosecution. 68 M.J. 325, 327 (C.A.A.F. 2010). That principle, in turn, traces back to the Supreme Court's decision in Jackson v. Virginia, 443 U.S. 307, 319 (1979). This body of case law concerns appellate review of a criminal conviction, not of an administrative decision.

[13] As the Supreme Court has explained, the "light most favorable" standard

> gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to

favorable" standard is equivalent to the presumption of regularity appears nowhere in the BCNR's record of decision. And it goes without saying that the agency "cannot retroactively justify its decision during court proceedings." Saint-Fleur v. McHugh, 83 F. Supp. 3d 149, 155 (D.D.C. 2015).

At base, if the BCNR has adopted the CG II MEF and JPL advisory opinion's standard of evidentiary review, that approach sits in tension with the government's otherwise meticulous efforts to *distinguish* between courts-martial and BOIs. Cf. Pl.'s MSJ at 26 ("[A]t the BOI, the Government relied heavily on the fact that [rules of evidence] do not apply to BOI proceedings. . . . The Government cannot claim the unreliable evidence was admissible because federal evidentiary rules do not apply, while also arguing that Major Del Castillo was required to meet those stringent standards in order to prove an error to the BCNR.").

Although there may be some way of squaring the circle here, neither the BCNR nor the opinions on which it has relied explain the basis for applying a "light most favorable" standard to administrative review of the BOI's decision. And if the BCNR did *not* in fact review the circumstantial evidence before the Board in this light, that much is simply not clear from the face of its decision. Cf. Dickson, 68 F.3d at 1405–07 (remanding case to the Army Board for Correction of Military Records where the court found it "impossible to discern the Board's 'path'" based on the explanation for its personnel decision). Either way, the Court cannot conclude that Major Del Castillo's argument is frivolous or that the slant of BCNR's review of the record would have been immaterial to the outcome of the agency's decision, given the

> the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

Jackson, 443 U.S. at 319 (emphasis added) (footnote omitted).

patently mixed state of the evidence. The Court will therefore remand to the BCNR for clarification as to the standard by which it reviewed the circumstantial evidence of a sexual relationship between Del Castillo and Burnett.

## IV. Conclusion

Major Del Castillo's present challenge to the BCNR's adverse corrections decision is a mixed bag. Remand is not warranted based on her newly-produced Sprint phone record evidence; the Recorder's commentary on her decision not to testify; or the government's delay in producing the text messages and phone records furnished by Mrs. Burnett.

However, Major Del Castillo has identified two aspects of the BCNR decision that do warrant remand to the agency. *First*, the BCNR did not address Del Castillo's argument that the Recorder's personal vouching for the authenticity and reliability of Mrs. Burnett's evidence—which was salient at the BOI hearing—may have prejudiced the Board. *Second*, the agency muddied the waters regarding the standard by which it reviewed the sufficiency of the circumstantial evidence proving Del Castillo and Burnett's sexual relationship. If the BCNR assessed evidence like Mr. Del Castillo's recanted statement, the BOQ receipts, and the Facebook exchanges in the light most favorable to the government, the basis for a deferential, court-martial standard of review is fundamentally unclear—and sits uncomfortably with the agency's erstwhile insistence that BOIs and courts-martial are procedurally distinct. Neither Del Castillo's vouching nor her standard-of-review argument is entirely frivolous or obviously immaterial. So the Court will remand the case to the BCNR for clarification on these two fronts because it is not at liberty to "substitute its judgment for that of the agency or supply a reasoned basis for the agency's decision that the agency itself has not offered." Pettiford, 774 F. Supp. 2d at 185 (cleaned up). It bears emphasizing that, on remand, "the BCNR is free to reject" Del

Castillo's contentions—but "it must expressly indicate that it has done so and explain its rationale." Id. (cleaned up).

For the foregoing reasons, the Court will grant in part and deny in part Major Del Castillo's motion for summary judgment and grant in part and deny in part the government's cross-motion. The case is remanded to the BCNR for further proceedings in line with this Memorandum Opinion. A separate Order shall issue.

CHRISTOPHER R. COOPER
United States District Judge

Date: August 19, 2026